# United States Court of Appeals
## For the First Circuit

Nos. 22-1195
     22-1218


UNITED STATES,

Appellee,

v.

REYNALDO ROSA-BORGES,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]


Before

Montecalvo, Hamilton,* and Rikelman,
Circuit Judges.


Kevin E. Lerman, Research & Writing Attorney, with whom Eric
Alexander Vos, Federal Public Defender, District of Puerto Rico,
Héctor L. Ramos-Vega, Interim Federal Public Defender, District of
Puerto Rico, and Franco L. Pérez-Redondo, Assistant Federal Public
Defender, Supervisor, Appeals Section, were on brief, for
appellant.

David C. Bornstein, Assistant United States Attorney, with
whom W. Stephen Muldrow, United States Attorney, and Mariana E.
Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate
Division, were on brief, for appellee.

_____

* Of the Seventh Circuit, sitting by designation.

April 26, 2024

**RIKELMAN, Circuit Judge.** In this set of appeals, Reynaldo Rosa-Borges challenges two sentencing decisions by the district court: a seventy-two-month sentence following his guilty plea for unlawful firearm possession under 18 U.S.C. § 922(g)(1) and a thirty-six-month sentence for violating the terms of his supervised release for a previous conviction with this new unlawful conduct.[1] Because the district court imposed both sentences based on factual findings derived from unreliable hearsay, we vacate and remand for Rosa's resentencing.

## I. BACKGROUND

We begin with the critical facts, drawn from "the uncontested parts of the probation officer's presentence investigation report (PSR), the plea agreement, and the transcript[s] of the sentencing [and revocation] hearing[s]." United States v. Colón-Cordero, 91 F.4th 41, 45 (1st Cir. 2024).

### A. Rosa's Arrests in 2014 and 2021

In December 2014, Puerto Rico police officers observed Rosa "engaging in what appeared to be a drug transaction." The officers searched Rosa and found a Glock pistol, marijuana, and various controlled medications. Rosa was subsequently charged with, and pleaded guilty to, carrying a firearm in furtherance of

---

[1] We refer to the appellant as "Rosa," consistent with his brief and "Spanish naming customs." United States v. Torres-Meléndez, 28 F.4th 339, 340 (1st Cir. 2022).

a drug trafficking crime in violation of 18 U.S.C. § 924(c).  The district court sentenced him to five years' imprisonment and five years' supervised release.  Rosa was released from prison in May 2019, at which point his five-year term of supervised release began to run.

On March 29, 2021, while Rosa was still on supervised release, he had another run-in with the police.  Police officers were patrolling a beach in Yabucoa, Puerto Rico, after learning about a drug shipment scheduled to land that evening.  The officers saw Rosa sitting in the back of a sports utility vehicle ("SUV") alongside another man, Ángel Luis Santiago-Dávila ("Santiago").  The SUV, which belonged to Santiago, was parked on the beach with the trunk facing the ocean.  The two men sat beneath the open trunk door.

The officers approached Rosa and Santiago.  During a conversation in which Santiago explained that he and Rosa had come to the beach to snorkel, the officers saw a firearm in the SUV's trunk.  They subsequently detained both men and seized from the car a loaded "7.62 caliber Norinco AK-47 type rifle-style pistol," "an ammunition magazine containing 30 rounds of 7.62 caliber ammunition," two bags of marijuana, and three cellular phones.

The following day, March 30, officers searched Rosa's aunt's home, where Rosa lived.  The search yielded two rifle magazines loaded with fifty-nine rounds of 7.62 caliber

ammunition, collectively, and forty-one loose rounds of identical ammunition (100 rounds total). Rosa's brother, Naim, was at the property when the agents arrived to execute the search warrant. In a sworn statement obtained by the police later that day, Naim said:

> [O]n March 30, 2021, [I] received a telephone call at around midnight from my brother Reynaldo Rosa telling me that if anything happens to him to go to the house, since I don't live there, to take out a green bucket from the bedroom[.] After that, I received a call from him at around 3AM telling me that he was under arrest at the Las Piedras command. I went to his residence to look for the bucket with no knowledge of what was inside. I picked it up and went to my home. When I got home, I opened the bucket to see what was inside and in it I found a black bag with what seemed to be a firearm. I didn't proceed to open the bag[.] I put everything away, bag and all, in a small safe with some boxes of ammo that were inside the bucket. I proceeded to put it away in the safe with the boxes of ammo and some individual pouches of marihuana, since I was nervous and didn't know what to do with it. Inside the green bucket there was also an open bag full of marihuana. Nervous, I went to his house to leave the bucket over there so I don't have that in my house. There was a lot of marihuana and I'm not [the type of] person that deals with these things, since I don't have anything to do with this, I don't consume it or anything. When I got to the house, without getting out of the vehicle, the agents arrived and read me the warnings to proceed in getting out of the vehicle. Nervous because of what was happening I got out and they gave me the search warrant. I told the agents that I don't live in that residence. I also let them know what I have in the vehicle and in my house without any fear since I know, and I let them know

that it isn't mine and that I had no knowledge of what was in the house and that I don't live there. They proceeded with the search in my presence. I also told them that I was in the residence during morning hours. I want to be clear that none of this nor whatever was seized in the house. It's not mine. It belongs to the one who resides in the house, Reynaldo Rosa[-]Borges. I have nothing to do with what was seized over there since I'm a responsible person dedicated to my studies and work. I also state that I'm willing to cooperate in anything that's necessary.

In short order, Rosa's probation officer notified the court that Rosa had violated the conditions of his supervised release by possessing the gun and ammunition on March 29 and 30. In May, Rosa appeared before a magistrate judge for a preliminary revocation hearing to determine whether there was probable cause to believe that he had violated the conditions of his supervised release. See Fed. R. Crim. P. 32.1(b)(1)(A).

Rosa argued at the preliminary revocation hearing that Naim's statement attributing possession of the 100 rounds of ammunition to him was unreliable, hinting that Naim was seeking to avoid his own criminal liability. He also pointed to inconsistencies between Naim's statement and the government's account. For example, the government insisted that Naim's bucket had been "empty" when he returned to Rosa's residence, which contradicted Naim's own sworn statement that he returned to the house with the bucket because it contained an "open bag full of marihuana" that he did not want in his own home. Separately, the

- 6 -

government suggested that Naim consented to a search of his own house and directed the police toward the firearm and ammunition in his safe. But the government did not provide any documentation to support this assertion, and it was ultimately never explained if the items in Naim's safe were counted as part of what was seized "at" Rosa's aunt's house. Although the magistrate judge expressed confusion about these competing accounts of the March 30 search, she nonetheless found probable cause to believe that Rosa had violated the conditions of his supervised release and referred him to a final revocation hearing.

One month later, on June 3, 2021, a grand jury indicted Rosa for being a felon in possession of a gun in violation of 18 U.S.C. § 922(g)(1).

## B. The Plea Agreement

Rosa pleaded guilty to Count Two of the indictment, which charged that:

> On or about March 29 and 30, 2021, in the District of Puerto Rico and within the jurisdiction of this Court, the defendant, REYNALDO ROSA-BORGES, knowing he had been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm and ammunition -- to wit: a 7.62 caliber Norinco rifle-style pistol . . . loaded with a bullet in the chamber and an ammunition magazine containing 30 rounds of 7.62 caliber ammunition, an ammunition magazine loaded with 25 rounds of 7.62 caliber ammunition, an ammunition magazine loaded with 34 rounds of 7.62 caliber ammunition, and 41 rounds of 7.62

> caliber ammunition -- said firearm having been
> shipped and transported in interstate and
> foreign commerce.

The plea agreement included this charge in full. Under its terms, the government and Rosa agreed to "recommend imprisonment within the low to middle of the applicable [United States Sentencing] Guidelines range." The parties also agreed that a recommendation above or below this range would constitute a material breach of the plea agreement.

The plea agreement also incorporated a stipulation of facts, which both parties agreed were "accurate in every respect." The stipulation described the events of March 29, 2021, when Rosa and Santiago were spotted by officers on the beach. Rosa admitted to "knowingly possess[ing]" the rifle-style pistol in the trunk and the magazine that contained thirty rounds of ammunition.

The stipulation did not include, however, any reference to the search of Rosa's residence on March 30 nor to the additional 100 rounds of ammunition seized that day. The government agreed to this omission at Rosa's request but emailed Rosa to note that "accommodating [his] request . . . should not be taken as a concession from the government that the [information] was incorrect." "Moreover," the government explained via email, "in sentencing the defendant, the [d]istrict [c]ourt could consider the events of March 30, 2021."

At the change-of-plea hearing, the district court read the charge in the plea agreement to Rosa. Rosa interjected to explain that although he "ha[d] no contest . . . as to that being the charge as to which he pleaded guilty," the stipulation of facts was "more limited" regarding "the ammunitions that were mentioned." The court responded that it would "get to the version of facts later on" and asked Rosa whether he was pleading guilty to the charge as read. After Rosa answered in the affirmative, the district court accepted his guilty plea.

## C. The Presentence Report

Before sentencing, the probation officer submitted a PSR noting that Rosa had been charged with and pleaded guilty to unlawful possession of a rifle-style pistol and 130 rounds of ammunition but omitting reference to the search in which the extra 100 rounds of ammunition were found. The government informally objected to this omission but, at Rosa's request, withdrew its objection. On December 8, 2021, the government emailed Rosa to explain that it agreed to withdraw its request to add information about March 30 because "the facts in the current version of the [PSR] [were] sufficient to support the government's sentencing recommendation under the [p]lea [a]greement," but its actions should not "be interpreted as a suggestion that the government would be in breach of the [p]lea [a]greement if it were to argue those facts in support of its sentencing recommendation."

Nonetheless, the following day, the probation officer submitted to the court an amended PSR that included the following paragraph ("paragraph 13"):

> 13. [O]n March 30, 2021, a search was conducted at Mr. Rosa[-]Borges['s] address of record which yielded the seizure of one rifle magazine . . . loaded with 25 ammunitions of Caliber 7.62 x 39, one rifle magazine . . . loaded with 34 ammunitions of caliber 7.62 x 39, and 40 ammunitions of Caliber 7.62 x 39. During the search a family member reported that the items seized belonged to Mr. Rosa[-]Borges.[2]

Rosa objected by email to the inclusion of this paragraph on the ground that "other person[s] lived and had access to the property including the 'family member' -- his brother Naim -- who avoided responsibility by laying responsibility at Mr. Rosa-Borges'[s] feet." The probation officer declined to remove it, however, because the count to which Rosa had pleaded guilty charged him with possessing the ammunition seized during the March 30 search, and thus "[t]he information [i]n paragraph 13 relate[d] to the [c]ount of conviction."

The PSR indicated that Rosa had a total offense level of nineteen and a criminal history category of III, which resulted in

---

[2] Paragraph 13 suggests that only ninety-nine rounds of ammunition were seized in the search. The government insists that the "correct amount is 100 rounds." We use 100 throughout this opinion because it makes the math simpler. In doing so, we express no opinion on this factual dispute because it does not impact our decision.

a guideline imprisonment range of thirty-seven to forty-six months. Rosa filed a sentencing memorandum in which he requested that the district court sentence him to thirty-seven months (the lowest end of this range). Rosa explained that he had gone to the beach to smoke marijuana with Santiago and only "became aware of a firearm laying beneath clothing and other articles in the [SUV]'s rear area" "[a]s the agents approached" the two men.

Separately, Rosa filed a formal objection to paragraph 13's inclusion in the PSR. He argued that the information was "derive[d] from unreliable sources" because "[t]he items . . . were found in a vacant bedroom," "others had access to [the premises]," and "[t]he information as to the alleged ownership of the items found was provided by . . . Naim . . . who had access to the property . . . and wanted to avoid his own criminal exposure." Although Rosa pleaded guilty to the firearm charge alleging that he possessed 130 total rounds of ammunition, Rosa argued that this did not "operate as a blanket admission of all facts." Rosa specifically emphasized that he negotiated for the plea agreement's stipulated facts to include only the 30 rounds found with the gun at the beach on March 29 because he would not have entered into a plea agreement that stipulated to his possession of the additional 100 rounds found on March 30.

One day before Rosa's consolidated sentencing and revocation hearings were to be held, the government submitted

- 11 -

evidence to the court to support the facts laid out in paragraph 13, including Naim's statement and an inventory of the evidence seized during the search. It did so "for the sake of completeness" and "[b]ecause [Rosa] ha[d] challenged those findings." After Rosa requested a continuance to respond to this motion, the court rescheduled the hearings for February 24, 2022.

### D. The Hearings

At the § 922(g)(1) sentencing hearing for the new unlawful conduct, Rosa renewed his objection to paragraph 13's inclusion in the PSR. After consulting with the probation officer present at the hearing, the court denied the objection and proceeded to sentencing. Rosa reiterated his request for a thirty-seven-month sentence. For its part, the government "st[ood] by the [p]lea [a]greement, and, accordingly, recommend[ed] a sentence of [forty-two] months of imprisonment." But it added that, "[c]onsidering the totality of the facts in this case," it "[did] not credit the defendant's story," advanced in his sentencing memorandum, "that he first saw the firearm shortly before the police arrived and that his possession was very brief."

Rosa responded that the government had breached the plea agreement by introducing evidence related to the March 30 search and alleging those facts at the hearing, which he contended the government did to "induce" the court to pronounce a

- 12 -

higher-than-agreed-upon sentence. The government characterized this accusation as "frivolous" and pointed to the email exchanges in which it retained the right to argue those facts "in support of the recommended sentence."

After the court denied the breach-of-plea-agreement claim, it pronounced Rosa's sentence for the § 922(g)(1) conviction. It agreed with the PSR's calculated guidelines range of thirty-seven to forty-six months. But, citing the Supreme Court's decision in Kimbrough v. United States, 552 U.S. 85 (2007), the court explained that it found an above-guideline sentence necessary to "reflect[] the seriousness of the offense, promote[] respect for the law, protect[] the public from additional crimes by Mr. Rosa, and address[] the issues of deterrence and punishment." In particular, it justified an upward variance based on the fact that the guidelines do not account for the amount or caliber of ammunition involved in an offense.[3] Thus, taking into account the ammunition possessed by Rosa and "the serious and acute problem of gun violence in Puerto Rico," the court sentenced Rosa to seventy-two months' imprisonment. Rosa objected to the sentence as procedurally and substantively unreasonable.

---

[3] Because we resolve this case on other grounds, we need not address Kimbrough's applicability nor the propriety of the district court's reliance on it.

At the supervised release revocation hearing that took place later that same afternoon, Rosa "restate[d] the objections made at the sentencing phase." But he also argued that relying on Naim's statement to revoke Rosa's supervised release without presenting the witness violated his limited confrontation right under Federal Rule of Criminal Procedure 32.1, which governs revocation proceedings. The government responded that Rosa had no such right at the revocation stage.

While the court was pronouncing Rosa's revocation sentence, the government interrupted to let the court know that Rule 32.1 does in fact provide a limited confrontation right to defendants in revocation proceedings. Thus, to "avoid any issues on appeal," the government asked the court "not [to] consider[] the March 30 events" in formulating Rosa's sentence. The court denied the request and sentenced Rosa to a consecutive term of thirty-six months' imprisonment for the supervised release violation.

Rosa immediately objected to the sentence as both procedurally and substantively unreasonable. The government then added that it understood that the court "ha[d] determined that the interests of justice [did] not require [any] witnesses to appear." The court responded only that the government "may have to argue" that issue on appeal.

## II. DISCUSSION

Before us, Rosa raises a host of challenges to his new-conduct and revocation sentences. His primary argument is that the government breached the plea agreement by introducing evidence regarding the March 30 search prior to sentencing and failing to argue persuasively for a mid-range sentence at the § 922(g)(1) sentencing hearing. He also challenges both sentences as procedurally and substantively unreasonable. After careful consideration, we find no breach of the plea agreement, but we conclude that procedural errors nonetheless warrant remand.

### A. Breach-of-Plea-Agreement Claim

Although Rosa recognizes that the government technically complied with its duty under the plea agreement to request a low- to mid-range sentence on the § 922(g)(1) violation, he argues that the government undermined its recommendation through implicit support of an upward variance. Rosa contends, for example, that the government encouraged the court to vary upward by filing the pre-hearing motion introducing evidence related to the March 30 search and indicating at the hearing that it "did not credit" Rosa's account of his brief possession of the gun, which he advanced in his sentencing memorandum.

Before reaching the merits of this claim, we address a few preliminary matters. First, as we previewed above, procedural errors alone warrant vacating and reversing Rosa's consolidated

- 15 -

sentence.  Nevertheless, we conclude that we need to address Rosa's plea-breach argument because, if it were successful, he would be entitled to be resentenced by a different judge.  See United States v. Clark, 55 F.3d 9, 14 (1st Cir. 1995).  And that is precisely the remedy Rosa requests here.  But our practice is to remand to a new judge "only in very unusual cases."  United States v. Vásquez-Méndez, 915 F.3d 85, 88 (1st Cir. 2019).  Thus, we address Rosa's plea-breach claim to determine whether Rosa is entitled to resentencing by a different judge, as he requests.

Second, the parties dispute the appropriate standard of review.  The government contends that Rosa did not preserve certain aspects of his plea-breach claim.  It points out that Rosa argued at the sentencing hearing that the government had breached the plea agreement by filing a pre-hearing motion to prove facts beyond those in the stipulation.  Thus, the government asserts, only that particular claim is preserved and subject to de novo review.  See United States v. Almonte-Nuñez, 771 F.3d 84, 89 (1st Cir. 2014).  Relying on United States v. Davis, 923 F.3d 228 (1st Cir. 2019), it urges us to apply plain-error review, at best, to Rosa's remaining plea-breach arguments.

We decline to do so because this case is not like United States v. Davis.  The defendant in Davis objected to certain conduct by the government at the sentencing hearing but did not raise the general objection that the government had breached the

- 16 -

plea agreement. Id. at 236-37. Here, by contrast, Rosa objected at the sentencing hearing that the government was "making a runaround around the [p]lea [a]greement" and pointed to the government's conduct both before and during the hearing in support. The district court immediately denied the objection and expressed frustration that the Federal Public Defender's office was making this allegation a "third time."[4] Given that the court was aware of the general nature of Rosa's plea-breach objection and already had forcefully denied it, we conclude that Rosa was not required to object throughout the hearing in order to preserve every aspect of his claim. See Davis, 923 F.3d at 236 ("The point of a timely objection is to bring a 'live' issue to the district court's attention at a time when the court can effectively address any error."). Thus, our review is de novo. See id.

As to the merits, we have previously found no breach when the government introduced facts outside the stipulation in the plea agreement in direct response to the defendant's argument that "his 'transgressions' were 'isolated'" and "to support its [sentencing] recommendation." United States v. Rivera-Ruiz, 43

---

[4] Rosa's argument at the sentencing hearing was the first time he claimed that the government breached the plea agreement. Per the government's brief to us on appeal, "[t]he court was referring to other cases in which the Federal Public Defender had argued that other prosecutors had breached a plea agreement by submitting additional facts to the court." See United States v. Mojica-Ramos, Nos. 22-1204, 22-1205 (1st Cir. argued Mar. 6, 2024); United States v. Aponte-Colón, No. 22-1422 (1st Cir. argued Mar. 6, 2024).

F.4th 172, 180 (1st Cir. 2022); see also United States v. Rivera-Rodríguez, 489 F.3d 48, 58 (1st Cir. 2007). Here, the government introduced additional evidence about the March 30 search only after Rosa claimed that his possession of the gun on March 29 was a fleeting, isolated incident. At sentencing, the government noted that it did not credit this account in explaining why it did not support Rosa's request for a low-end guidelines sentence. Thus, we construe the government's introduction of the March 30 evidence as an effort to support its own mid-range sentencing recommendation in direct response to Rosa's characterization of his conduct.

To be sure, when coupled with the government's attack on Rosa's credibility immediately following its sentencing recommendation, we find somewhat troubling the government's repeated attempts to draw the court's attention to the 100 additional rounds of ammunition. But the government's conduct was ultimately consistent with both the text and the "spirit" of the plea agreement. Rivera-Ruiz, 43 F.4th at 180. Rosa knowingly pleaded guilty to a charge of possessing 130 rounds of ammunition, so the court was already on notice of this conduct. The government acquiesced to Rosa's requests to omit information about the March 30 search from the plea agreement and PSR but, in doing so, advised Rosa that it retained the right to rely on those facts to support its sentencing recommendation. It was the probation officer's

decision to add paragraph 13 to the PSR, even after the government had withdrawn its request to add the information regarding the events of March 30.  And the government was under no obligation to support the version of events advanced in Rosa's sentencing memorandum.  Under these circumstances, we find that the government did not breach the plea agreement.

### B. Procedural Reasonableness

Rosa argues next that the district court's sentencing decisions were procedurally and substantively unreasonable.  We begin, as we usually do, with the procedural claims.  United States v. Leach, 89 F.4th 189, 195 (1st Cir. 2023) ("In adjudicating sentencing appeals, we typically begin by 'examin[ing] any claims of procedural error' and -- if no procedural error is found -- proceed to examine any challenge to the substantive reasonableness of the sentence." (alteration in original) (quoting United States v. Díaz-Lugo, 963 F.3d 145, 151 (1st Cir. 2020))); see also United States v. Díaz-Rivera, 957 F.3d 20, 25 (1st Cir. 2020).

In Rosa's view, there were multiple procedural errors below, but we need to evaluate only two of those claimed errors to resolve these appeals.  First, Rosa argues that the district court violated Federal Rule of Criminal Procedure 32(i)(3)(B) by failing to rule on a disputed factual issue in the PSR -- namely, whether Rosa had possessed the additional 100 rounds of ammunition.

Second, by crediting Naim's statement, Rosa contends that the district court imposed sentences based on unreliable hearsay. We address each argument in turn.

### i. Federal Rule of Criminal Procedure 32(i)(3)(B)

At sentencing, the district court "may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A). But "for any disputed portion of the presentence report," the court must, under Rule 32(i)(3)(B), "rule on factual disputes or conclude that a ruling is unnecessary because the court will not take the disputed matter into account when sentencing." United States v. Ford, 73 F.4th 57, 61, 63 (1st Cir. 2023) (quoting Fed. R. Crim. P. 32(i)(3)(B)). Although we prefer that the judge make an explicit ruling under this provision, we will not reverse "so long as the record read as a whole reliably shows that the judge implicitly resolved the defendant's objections." Id. at 62 (cleaned up) (citation omitted). If the "court's statements and the sentence imposed show that the facts were decided in a particular way," then we can infer that the district court implicitly resolved the factual dispute at issue. United States v. Van, 87 F.3d 1, 3 (1st Cir. 1996).

Rosa contends that the district court failed to rule on the parties' dispute about whether he possessed the extra 100 rounds of ammunition. In response, the government argues that "there were no disputed facts before the court" because Rosa did

not challenge the fact that (1) a search occurred at Rosa's residence during which 100 rounds of ammunition were seized and (2) a family member told the officers executing the search that the ammunition belonged to Rosa. The parties disagree, too, over whether Rosa preserved his Rule 32(i)(3)(B) argument by objecting on this ground to the district court.

We need not wade into these particular disagreements. See United States v. Carbajal-Váldez, 874 F.3d 778, 783 (1st Cir. 2017) ("[C]ourts should not rush to untangle knotty legal questions when there is no real need to do so."). Even assuming that Rosa preserved his objection, and the factual dispute is properly characterized as whether Rosa possessed the extra 100 rounds of ammunition, the "court's statements and the sentence imposed," Van, 87 F.3d at 3, make clear that the district court implicitly resolved this issue. At sentencing, the district court denied Rosa's request to remove paragraph 13 from the PSR. When it summarized Rosa's conduct, it described the ammunition seized during the March 30 search and its attribution of that ammunition to Rosa. And when it varied upward to seventy-two months' imprisonment, the district court did so because the guidelines "do not take into account the amount of ammunition . . . possessed by a defendant charged with possession of a firearm," and "[h]ere we have a defendant who possessed . . . 130 rounds of . . . ammunition." Thus, because the record "makes manifest

that the court impliedly adopted" the view that Rosa possessed an additional 100 rounds of ammunition, Rosa's Rule 32(i)(3)(B) challenge fails.  Carbajal-Váldez, 874 F.3d at 784.

### ii. Sentencing Based on Unreliable Information

The district court's implicit ruling on this disputed factual issue, however, does not end our procedural reasonableness inquiry.  Although "a district court has broad discretion at sentencing to consider information pertaining to the defendant and the defendant's offense conduct," United States v. Millán-Isaac, 749 F.3d 57, 69 (1st Cir. 2014), "it is axiomatic 'that a convicted defendant has the right to be sentenced on the basis of accurate and reliable information.'"  United States v. Ramos-Carreras, 59 F.4th 1, 5 (1st Cir. 2023) (quoting Rivera-Rodríguez, 489 F.3d at 53).  Indeed, due process requires it.  United States v. Rondón-García, 886 F.3d 14, 21 (1st Cir. 2018); see also United States v. Tucker, 404 U.S. 443, 447 (1972); Townsend v. Burke, 334 U.S. 736, 741 (1948).  Thus, imposing a sentence based on factual findings that are, in turn, "based solely on unreliable evidence" constitutes reversible error.  United States v. Castillo-Torres, 8 F.4th 68, 71 (1st Cir. 2021); see also Rivera-Ruiz, 43 F.4th at 181 (noting that we "assay the court's factfinding for clear error" when reviewing preserved procedural claims (citation omitted)).  We review reliability determinations for abuse of discretion.  Castillo-Torres, 8 F.4th at 71.

Here, the district court found that Rosa possessed 130 rounds of ammunition. It made this finding on the basis of Naim's statement "indicat[ing] that the items seized belonged to [Rosa]." And the district court relied on this statement at both hearings -- first, to extend Rosa's new-conduct sentence and, second, to extend his revocation sentence. Although sentencing and revocation proceedings are subject to different legal standards regarding evidence, we conclude that the court's reliance on Naim's statement was nonetheless erroneous in each proceeding based on the reliability concerns we discuss below.

We begin with a key point: Naim's statement, as an out-of-court statement offered for its truth -- i.e., that the seized ammunition belonged to Rosa -- constitutes hearsay.[5] See United States v. Ramos-Baez, 86 F.4th 28, 71 (1st Cir. 2023). And although a "sentencing court has broad discretion to accept hearsay evidence," Rondón-García, 886 F.3d at 21 (citation omitted), it cannot do so "[r]eflexively," United States v. Colón-Maldonado,

---

[5] Puzzlingly, the government resists this characterization of Naim's statement. But it is black-letter law that any statement "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement" constitutes hearsay. Fed. R. Evid. 801(c). Naim's statement was not made at the sentencing hearing. And it was offered to prove that Rosa possessed the ammunition seized on March 30; indeed, the statement would have been entirely irrelevant if not offered for its truth. Thus, we reject the government's position that the statement is not hearsay.

953 F.3d 1, 10 (1st Cir. 2020). Instead, hearsay evidence used at sentencing must be supported by other "indicia of trustworthiness." Rondón-García, 886 F.3d at 21; see also Colón-Maldonado, 953 F.3d at 10 ("[W]hen a court extends a defendant's sentence based on hearsay, there must be other signs . . . to permit a reasoned conclusion that the statements are still reliable.").

Although "conventional substitutes for live testimony," such as sworn statements, "ordinarily possess sufficient indicia of reliability," the inference is not automatic. United States v. Marino, 833 F.3d 1, 5 (1st Cir. 2016) (emphasis added) (quoting Gagnon v. Scarpelli, 411 U.S. 778, 782 n.5 (1973)); see also Colón-Maldonado, 953 F.3d at 11 (explaining that affidavits "usually pass[] muster" (emphasis added)). We still must assess whether the statement is supported by other indicia of trustworthiness. For example, in United States v. Brewster, we held that the district court had not abused its discretion by relying on a notarized statement at sentencing to find that the defendant had a history of domestic abuse. See 127 F.3d 22, 28 (1st Cir. 1997). The defendant "virtually conceded the statement's accuracy below, and failed to dispute the statement's contents in the face of the district judge's explicit warning that, if accepted as true, the statement would form part of the foundation upon which the judge would decide what sentence should be levied." Id.

(footnote omitted).  Thus, we viewed the defendant's "refusal to disavow the government's accusations . . . as an indicium of the proffered information's trustworthiness," in addition to the fact that the statement was made under penalty of perjury.  Id.

Here, by contrast, Rosa has consistently challenged the truthfulness of Naim's statement.  Further, he repeatedly characterized the statement as "unreliable" because it did not account for the facts that the ammunition was not seized in Rosa's room, various people had access to the residence, including Naim, and Naim was incentivized to avoid his own criminal exposure.

Although recognizing the deference built into the abuse of discretion standard, our review leads us to conclude that Rosa's arguments have merit for two reasons.  First, the particular written statement at issue here, on its face, contains inconsistencies, or at least logical gaps, and demonstrates Naim's concern with avoiding criminal liability.  Second, Naim's statement contradicts in several respects testimony by the government about the events of March 30.  Given these gaps and inconsistencies, the district court abused its discretion in relying on this hearsay statement to increase Rosa's sentence.

To recap, in his statement, Naim describes responding to his brother's request via a telephone call at 3:00 a.m. on March 30 to pick up a "bucket" from "the bedroom" of Rosa's residence with "no knowledge of what was inside."  Naim then allegedly took

the bucket home, found a firearm and ammunition inside it, and put those items along with several "individual pouches" of marijuana he also found in the bucket into his safe, before returning the bucket, which contained another "open bag full of marihuana," to Rosa's residence. The police intercepted him outside of Rosa's residence, where a "nervous" Naim claimed to have "no knowledge of what was in the house" while simultaneously swearing that "whatever was seized" belonged to Rosa.

This statement raises questions that tend to undermine its reliability, at least without an opportunity to confront Naim and ask about the apparent discrepancies. First, Naim claims that he returned the bucket to Rosa's residence to avoid having marijuana "in [his] house" because he "[does not] consume" marijuana and is "not [the type of] person that deals with these things." Yet Naim admitted that he had placed the "individual pouches" of marijuana he found in the bucket into his safe. His statement does not explain why he decided to return the bag of marijuana but not the "individual pouches" if he did not want marijuana "in [his] house." Second, Naim emphasized to the officers that he "[did not] live" in the house that they searched and "had no knowledge of what was in [there]." Thus, it is not clear why Naim would be able to say reliably that "whatever was seized" belonged to Rosa.

Further, Naim's statement contradicts in several respects the government's version of events. The government argued at Rosa's preliminary revocation hearing that there was nothing in the bucket that Naim had with him when officers intercepted him in front of Rosa's residence on the morning of March 30. But Naim's statement makes clear that he came back to Rosa's house with an "open bag full of marihuana" in the bucket precisely to return the marijuana to Rosa's residence because Naim did not want to store it at his own home. And the government did not explain what reason Naim might have had for returning an empty bucket to his brother's house the morning of Rosa's arrest. Nor was the government consistent in its account of where the bucket was found. During the hearing, the prosecutor at one point seemed to suggest that it had been seized at Naim's house. Further, although Naim stated that he ran into the police when he pulled up to Rosa's aunt's house to drop off the bucket purportedly containing marijuana, the probation officer's summary of the police's inventory from the search did not mention a bucket or marijuana and specified that the items seized were "found to be inside" the aunt's house, not in Naim's car.

Finally, Naim's concerns about criminal liability reflected in the statement were legitimate: He was intercepted by officers after he had removed contraband from the house and while he (according to his own statement) had at least one bag of

marijuana in his car. Statements to law enforcement against an individual's own self-interest tend to be deemed reliable, see, e.g., United States v. Teixeira, 62 F.4th 10, 23 (1st Cir. 2023), but the converse is also true. An individual's highly self-serving statement to law enforcement is less likely to be reliable. Under these circumstances, we find that the reliability of Naim's statement assigning ownership to Rosa is severely diminished.

Aside from these issues, Naim's account also raises an unresolved question. It is entirely unclear whether the items that Naim removed from Rosa's house and placed in his own safe were counted among the inventoried items seized on March 30. The government claimed at the preliminary revocation hearing that Naim's house was searched with his permission and the firearm and ammunition were seized from his safe. But Naim's statement references only a search of Rosa's residence, not his own, and the police officer's inventory lists Rosa's, not Naim's, residence as the location where the 100 rounds of ammunition were found. We therefore cannot discern from the record whether the ammunition that Naim allegedly took from Rosa's house and put in his own safe was included in the March 30 inventory.

The government nonetheless contends before us that the district court did not err in relying upon the statement because "the magazines and ammunition in [Rosa's home] . . . shared the same unusual caliber as the loaded pistol he possessed." To be

- 28 -

sure, "[o]bjective evidence that corroborates a witness's testimony may provide persuasive proof of that testimony's reliability." United States v. Fontanez, 845 F.3d 439, 443 (1st Cir. 2017) (emphasis added); cf. United States v. Franklin, 51 F.4th 391, 397 (1st Cir. 2022) (suggesting that a hearsay statement can be reliable, even when the speaker had a motivation to lie, when there is substantial corroborating evidence in the record). But we cannot conclude that it does so here. As we described above, Naim's statement raises many troubling questions, none of which the government addressed in its briefing. And we have no evidence before us, other than the government's simple assertion, to suggest that the seized ammunition is so unusual or rare that we should overlook these issues.

In sum, Naim's sworn statement was self-serving and confusing, and it contradicted in several respects the government's version of events. The sole indicator of trustworthiness proffered by the government -- that the seized ammunition matched the loaded pistol found in Santiago's SUV on March 29 -- is insufficient to overcome the statement's significant inconsistencies. Under these specific circumstances, we conclude that the district court abused its discretion by finding the statement reliable. And because the statement was not reliable, the district court erred by considering it as a basis to vary upward in imposing Rosa's § 922(g)(1) sentence.

This leads us, necessarily, to the same conclusion about the revocation sentence. A court's discretion to rely on hearsay evidence is even more limited in revocation proceedings than at sentencing. As we described above, during sentencing proceedings, hearsay is admissible so long as it bears sufficient indicia of reliability. See United States v. Ramírez-Negrón, 751 F.3d 42, 52 (1st Cir. 2014). In revocation proceedings, the court's discretion to rely on hearsay evidence is further circumscribed by Federal Rule of Criminal Procedure 32.1(b)(2)(C), "which states that a defendant in a revocation proceeding may 'question any adverse witness unless the court determines that the interest of justice does not require the witness to appear.'" United States v. Navarro-Santisteban, 83 F.4th 44, 52 (1st Cir. 2023) (quoting Fed. R. Crim. P. 32.1(b)(2)(C)). But a defendant's right to be sentenced based on reliable evidence applies equally to sentences imposed upon the revocation of supervised release. See Colón-Maldonado, 953 F.3d at 9. Thus, the court's misplaced reliance on Naim's statement is sufficient for us to vacate not only the § 922(g)(1) sentence but also the thirty-six-month revocation sentence.

Accordingly, we decline to address Rosa's argument that by revoking his supervised release and sentencing him to thirty-six months' imprisonment based in part on Naim's statement without providing him the opportunity to cross-examine Naim, the district

court violated his limited confrontation right under Rule 32.1(b)(2)(C).[6] We take this route for a practical reason: Whether this limited confrontation right applies during a revocation hearing's "sentencing phase" is an open question in this circuit. Colón-Maldonado, 953 F.3d at 8; see also United States v. Torres-Santana, 991 F.3d 257, 265-66 (1st Cir. 2021). In previous cases, we declined to resolve the question because the appellant's challenge to the revocation sentencing court's use of hearsay evidence succeeded under the more general reliability test. See Colón-Maldonado, 953 F.3d at 9; Navarro-Santisteban, 83 F.4th at 55. Thus, we follow the example of previous panels and take that same approach today.[7]

### III. CONCLUSION

Because the court's reliance on unreliable hearsay justifies vacating Rosa's consolidated sentence and remanding for resentencing, we end our analysis here. See Colón-Cordero, 91 F.4th at 58 (vacating and remanding based on a procedural error and therefore "leav[ing] untouched and intimat[ing] no view on [the defendant's] other appellate challenges to his sentence[]").

---

[6] The court did not find at the revocation hearing that "the interest of justice" did not require Naim to appear, which Rosa contends was reversible error.

[7] We note, however, that Rule 32.1(b)(2)(C) unquestionably applies during the guilt phase of a revocation hearing, and thus the government erroneously informed the court that "at the revocation stage . . . there's no right to confrontation."

- 31 -

We **vacate** Rosa's new-conduct and revocation sentences and **remand** to the district court for resentencing consistent with this opinion.